**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **VILLAGE RED RESTAURANT CORP. d/b/a** | : | **Case No. 18-10960 (MEW)** |
| **WAVERLY RESTAURANT,** | : | |
| | : | |
| Debtor. | : | |

-------------------------------------------------------------x

| | | |
|---|---|---|
| **CHRISTOPHER F. GRAHAM, as Plan** | : | |
| **Administrator of the Estate of Village Red** | : | |
| **Restaurant Corp.,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| -against- | : | **Adv. Proc. No. 20-01065 (MEW)** |
| | : | |
| **CHRISTINE SERAFIS,** | : | |
| | : | |
| Defendant. | : | |

-------------------------------------------------------------x

| | | |
|---|---|---|
| **CHRISTOPHER F. GRAHAM, as Plan** | : | |
| **Administrator of the Estate of Village Red** | : | |
| **Restaurant Corp.,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| -against- | : | **Adv. Proc. No. 20-01066 (MEW)** |
| | : | |
| **135 WAVERLY REALTY, LLC,** | : | |
| | : | |
| Defendant. | : | |

-------------------------------------------------------------x

## <u>DECISION AFTER TRIAL</u>

A P P E A R A N C E S:

ECKERT SEAMANS CHERIN & MELLOTT, LLC
White Plains, NY and Pittsburgh, PA
*Attorneys for the Plan Administrator*
   By:  Harry A. Readshaw, Esq.
        Ren-Ann A. Wang, Esq.

1

MITCHELL & INCANTALUPO
Forest Hills, NY
*Attorneys for Defendants*
  By: John A. Mitchell, Esq.

**HONORABLE MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

      Plaintiff Christopher F. Graham is the Plan Administrator (the "**Plan Administrator**")

charged with the resolution of certain matters under the confirmed plan of reorganization of Village

Red Restaurant Corp ("**Village Red**"). Defendant Christine Serafis was the sole owner of Village

Red. She also was the sole owner of 135 Waverly Realty, LLC ("**135 Waverly**"), which owned

the space that Village Red leased for the conduct of a restaurant business. The Plan Administrator

contends that Ms. Serafis received transfers from Village Red during the years 2012 through 2018

that were fraudulent as to creditors and that are recoverable by the Plan Administrator. The

Complaint asserts a variety of fraudulent transfer claims under section 548 of the Bankruptcy Code

and fraudulent conveyance claims under sections 273 through 276 of the New York Debtor and

Creditor Law (the "NY DCL"), though at trial and in its post-trial submissions the Plan

Administrator's contentions about the prepetition payments to Ms. Serafis focused almost

exclusively on claims under sections 273 and 273-a of the NY DCL. The Plan Administrator also

contends that certain payments that Village Red made to 135 Waverly were not authorized and are

recoverable under section 549(a) of the Bankruptcy Code. Finally, the Plan Administrator

contends that the terms of the confirmed plan of reorganization bar 135 Waverly from receiving

any distribution with respect to its alleged unsecured claim and/or that the claim has been

overstated. Defendants have denied the Plan Administrator's contentions and the matter was the

subject of a trial that was conducted on April 22, 2021. The Court received post-trial submissions

on certain issues and then took judicial notice of certain matters on May 18, 2021.

For the reasons set forth below, the Court concludes that the Plan Administrator is entitled to: (1) the entry of judgment against Serafis in the amount of $623,459.89; (2) the entry of judgment against 135 Waverly in the amount of $918,216.27; and (3) an order striking 135 Waverly's claim as an unsecured creditor.

### Jurisdiction and Authority to Render a Final Decision

The parties have agreed in their Joint Pretrial Order that the Court has subject matter jurisdiction, and they have consented to the entry of a final judgment by this Court. *See* 28 U.S.C. § 157(c)(2); *Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932, 1948-49 (2015).

### Background

Village Red operated the Waverly Restaurant in Greenwich Village. For many years the restaurant was managed by Nicholas Serafis, who was the father of defendant Christine Serafis. In 2003, Nicholas Serafis caused the ownership of Village Red to be transferred to Christine Serafis. Ms. Serafis testified that she understood that the ownership transfer had been made for estate planning purposes. Ms. Serafis also acquired ownership of 135 Waverly prior to 2003. Nicholas Serafis continued to manage the restaurant after 2003, but Christine Serafis was named as President of Village Red. Mr. Serafis became ill in 2017, at which point his duties were assumed by a Manager named John Captan, who had been a long-time employee of Village Red.

### A.      The Challenged Prepetition Transfers to Christine Serafis

The parties have stipulated that Village Red made ten separate dividend payments to Christine Serafis in November and December 2017 in the total amount of $86,000. The parties have also stipulated that Village Red made salary payments to Ms. Serafis in the following amounts during the following years, in the total amount of $347,875:

| Year | Amount |
|------|--------|
| 2012 | $42,300 |
| 2013 | $59,085 |
| 2014 | $63,180 |
| 2015 | $63,180 |
| 2016 | $63,180 |
| 2017 | $45,750 |
| 2018 | $11,200 |

The Plan Administrator contends that Ms. Serafis did not actually provide any meaningful services to Village Red and that the salary payments, as well as the dividend payments, were made without consideration.  The Plan Administrator further contends that the salary payments and dividend payments were made at times when Village Red was insolvent, or when Village Red had unreasonably small capital for the conduct of its business, or when Village Red intended or believed that it was incurring debts that it would be unable to pay. The Plan Administrator also contends that the payments were made with the actual intent to hinder, delay or defraud creditors.[1]

Serafis has denied the Plan Administrator's contentions.  She contends that the salary and dividends were warranted and reasonable in light of her responsibilities, duties, obligations and ownership interests in Village Red and in light of various financial exposures she faced in her capacities as owner of Village Red and as guarantor of some of Village Red's obligations to

---

[1]    The Complaint also asserted that the dividend payments were illegal under New York law because the Debtor was insolvent, but that claim was not addressed in the Joint Pretrial Order. The Joint Pretrial Order is deemed to have superseded the pleadings as to the claims of the parties.  [Adv. Pro. No. 20-1065, ECF No. 14, at p. 9; Adv. Pro. No. 20-1066, ECF No. 15, at p. 9].  Accordingly, any claim asserted in the Complaint that was not addressed in the Joint Pretrial Order is deemed to have been dropped.

vendors.  In addition, Serafis contends that as the sole owner of 135 Waverly she has the right to offset any rent arrears owed to 135 Waverly against any liability she might have to return funds to the Plan Administrator pursuant to the fraudulent transfer and fraudulent conveyance claims.

## B.    Post-Petition Transfers to Christine Serafis

The Plan Administrator alleges that salary payments to Ms. Serafis were raised to $2,000 per week after the Debtor's bankruptcy filing, even though Ms. Serafis spent 80% of her time in Greece and the actual management of the restaurant was handled by Mr. Captan.  The Plan Administrator contends that the salary increase was not done in the ordinary course of business and that the payments are recoverable under section 549 of the Bankruptcy Code.  Ms. Serafis contends that the salary payments were reasonable, were made in the ordinary course of business, and did not require Court approval.

## C.    Post-Petition Transfers to 135 Waverly

Village Red leased space from 135 Waverly and executed a lease dated May 1, 2013 that had an initial term that ran through May 31, 2018.  The Lease called for the payment of monthly rent of $25,000.  The parties have stipulated, however, that in fact Village Red never paid that amount prior to its bankruptcy filing.  Instead, it regularly paid $11,000 in rent.  The only explanation offered at trial was that Village Red could not afford to pay the higher amount specified in the Lease.

Village Red issued five checks payable to 135 Waverly on January 1, 2018 in the amount of $11,000 each for the purpose of covering rents from January 2018 through May 2018.  It filed its bankruptcy petition a few months later, on April 6, 2018.

After the bankruptcy filing, Village Red made an additional rent payment of $14,000 for the month of May 2018, raising the rent for that month to $25,000.  Its lease expired at the end of

May 2018 and Village Red did not exercise any renewal options. Beginning in June 2018, Village Red made monthly rent payments of $53,000 per month, except that only $50,000 was paid in September 2018 due to a decline in business. The $53,000 monthly payments continued through confirmation of Village Red's plan of reorganization. No Court approval for the increased rent was sought or obtained.

After the close of evidence the Court directed the parties to consult prior transcripts of proceedings to identify any prior statements or disclosures that had been made regarding Village Red's rent payments. On May 18, 2021, the Court took judicial notice of certain statements that had been made during prior court hearings. More particularly, the Court noted that Village Red's rent payments had been the subject of questions by the Court during a status conference on September 26, 2018. The Court asked at that time if Village Red had been paying rent, and counsel to Village Red replied that the rent payment for August 2018 had been $53,000. The Court then asked how the amount of rent had been determined if the prior lease was no longer in effect. Village Red's counsel responded that "[i]t's just what they've been paying historically over time, your honor." The Court does not believe that counsel intended to be misleading, but in fact counsel's statement was untrue. The parties have stipulated in this proceeding that Village Red historically had paid $11,000 per month in rent, not $53,000. The rent actually paid by Village Red did not represent a continuation of historical practices at all, but instead represented more than a four-fold increase in the rent that was being paid to an affiliated company.

The fact that rent payments had increased apparently did not come to the attention of other parties in interest until 2019, in the context of an investigation performed by the NLRB, which had made claims on behalf of certain employees. At a hearing on August 14, 2019, the Court was informed that there might have been overpayments of rent, that there might have been payments

of real estate taxes that were not called for, and that the parties were working on finding someone who could investigate those issues. The Court noted at the hearing that the Court had had no idea that the post-petition rents were more than four times higher than the usual pre-petition rents and that no party had sought approval for the increase. The Court also asked Village Red's counsel if he had been aware of the rent increase, and he said he had not known about it.

The Plan Administrator contends that Village Red never obtained Bankruptcy Court approval to make increased rent payments after May 2018, that the proper rent should have been only $11,000, and that the extra payments that were made to 135 Waverly (in the total amount of $767,000) were unauthorized transfers of estate property that are subject to avoidance under section 549 of the Bankruptcy Code. The Plan Administrator also challenges $124,000 of post-petition property taxes paid by Village Red and $20,000 of post-petition payments that Village Red made for repairs or renovations to its restaurant. 135 Waverly and Serafis admit that they did not seek this Court's approval of increased rent payments, tax payments or repair payments, but they contend that the new rent arrangements were made in the ordinary course of business, that the rent payments and other payments were reasonable in amounts, and that this Court's approval was not required.

### D.    135 Waverly's Unsecured Claim

When Village Red filed its Schedules of Assets and Liabilities it listed an unsecured claim owed to 135 Waverly in the amount of $860,000, representing the difference between the $25,000 monthly rent specified in the underlying lease and the $11,000 monthly rents that were actually paid from May 2013 through April 2018. *See* Case No. 18-10960, ECF No. 1, Schedule E/F, at 3.1. The Schedules were verified by Ms. Serafis (who owned both Village Red and 135 Waverly), and they indicated that the debt was not contingent, unliquidated or disputed. *Id.*

7

In 2018, Village Red proposed to sell its assets to 135 Waverly in exchange for $50,000. As noted above, the National Labor Relations Board had pursued claims on behalf of some employees.  The NLRB sought discovery and obtained permission to conduct examinations of witnesses in connection with the proposed sale.  In support of its application for permission to conduct such discovery the NLRB noted that Village Red had made large payments to 135 Waverly, and stated that the NLRB wished to examine the parties' dealings in order to determine whether the proposed sale should go forward and whether 135 Waverly had received any improper transfers.  The asset sale was postponed until such time as Village Red and the NLRB agreed to a stipulation under which the sale price would be increased to $100,000, which would be distributed pursuant to a confirmed plan of reorganization.

In 2019, Village Red proposed a plan of reorganization.  The Disclosure Statement listed the "scheduled" and "filed" claims that would be treated as general unsecured creditor claims if Village Red's plan of reorganization were approved.  [Case No. 18-10960, ECF No. 51-5.]  Only one unsecured claim was listed among the "scheduled" claims to be paid: namely, a $3,118.83 claim in favor of Chase Bank.  All of the "filed" unsecured claims that were identified in the various versions of the Disclosure Statement were filed by employees who had made claims under the Fair Labor Standards Act and other federal and state labor laws.  An amended version of the Disclosure Statement similarly did not mention any unsecured claim owing to 135 Waverly.  *See* Case No. 18-10960, ECF No. 60-5.  The proposed plan of reorganization stated that general unsecured claims totaled $5,347,616.81, which included only the employee claims and the Chase Bank claim.  [Case No. 18-10960, ECF No. 61.]

8

Ms. Serafis signed the Disclosure Statement and was aware of its contents. The parties have stipulated, and the record confirms, that 135 Waverly received copies of the proposed Disclosure Statement and raised no issues.

The Court also took judicial notice of certain statements that had been made during prior hearings in connection with the Court's approval of the Disclosure Statement and confirmation of the plan. More specifically:

- Counsel to Village Red reported on the terms of the proposed plan of reorganization during a hearing on October 30, 2018. At that time counsel stated that the assets would be sold for $50,000, which would provide small recoveries for unsecured creditors. He stated that those unsecured creditors were former employees and the NLRB.

- During a hearing on August 14, 2019 counsel to the NLRB and counsel to Village Red reported to the Court that it was possible that Village Red had paid too much to 135 Waverly during the course of the case. The Court asked at that time if the unsecured claim recoveries that were described in the Disclosure Statement included any payments towards claims by 135 Waverly. Counsel to Village Red stated explicitly that the calculations assumed no such payments.

- During a hearing on September 17, 2019 counsel to Village Red confirmed that the only administrative claims to be paid under the proposed plan of reorganization were counsel fees; that there were no priority claims; that all of the employee claimants had voted in favor of the plan; and that there were no other creditors except for Chase.

The Plan Administrator contends that Serafis and 135 Waverly waived any claim against Village Red by leaving that claim out of the exhibits to the Disclosure Statement and the confirmed plan of reorganization. The Plan Administrator also contends that the "true" agreed rent was

$11,000 (not $25,000) and that the listed claim in favor of 135 Waverly should be expunged.

Serafis and 135 Waverly contend that the listed claim reflected an obligation that was owed to 135

Waverly under the lease, that no express waiver ever occurred and that the claim should be

allowed. They also contend that the Plan Administrator should be estopped from objecting to the

claim because Village Red listed the claim in its Schedules and stated that the claim was not

contingent, unliquidated or disputed.

Discussion

### 1.    The Plan Administrator's Standing to Pursue Avoidance Action Claims

The Plan Administrator asserts claims under section 548 of the Bankruptcy Code. He also

asserts claims under New York State law pursuant to section 544 of the Bankruptcy Code. If the

Plan Administrator establishes that a transfer should be avoided under section 548 or section 544,

then section 550 of the Bankruptcy Code allows the Plan Administrator to recover the transfer (or

the value of the transfer) from the immediate transferee or, subject to certain standards, from

subsequent transferees. *See* 11 U.S.C. § 550.

The Plan Administrator admittedly stands in the shoes of the estate pursuant to the terms

of the confirmed plan of reorganization and has the right to assert claims under section 548 of the

Bankruptcy Code with respect to transfers that were made on or after April 6, 2016. The issue is

more complicated, however, with respect to claims under section 544.

Section 544(b)(1) of the Bankruptcy Code provides that "the trustee may avoid any transfer

of an interest of the debtor in property" so long as the transfer is voidable under applicable law

"by a creditor holding an unsecured claim that is allowable under [11 U.S.C. § 502] or that is not

allowable only under [11 U.S.C. § 502(e)]." The Plan Administrator's right to pursue claims

under section 544 therefore depends on the existence at least one actual unsecured creditor who

holds an allowable claim and who would have had the right to pursue avoidance claims under the applicable state law. *In re Musicland Holding Corp.*, 398 B.R. 761, 777 (Bankr. S.D.N.Y. 2008) (noting that there must be a creditor who could have avoided a transfer under state law and who also holds an allowable claim in the bankruptcy case in order for a trustee to have standing to pursue a state law fraudulent transfer claim under section 544(b)). A single creditor who may pursue a particular claim is sufficient to "trigger" the Plan Administrator's standing to pursue the claim under section 544. *Id.* (*citing MC Asset Recovery, LLC v. Southern Co.*, No. 06-cv-0417, 2006 U.S. Dist. LEXIS 97034, at *17-18 (N.D. Ga. Dec. 11, 2006). Once a trustee establishes the existence of a triggering creditor, the trustee may seek to avoid a fraudulent transfer "not only for the benefit of that creditor, but also for the benefit of all of the unsecured creditors of the estate." *Silverman v. Sound Around, Inc. (In re Allou Distribs.)*, 392 B.R. 24, 32 (Bankr. E.D.N.Y.2008).

Village Red is a New York corporation and it had its sole place of business in New York. The parties agree that New York law governs the state law avoidance claims that the Plan Administrator seeks to assert. New York adopted the Uniform Voidable Transactions Act in 2019, but the new provisions of that act are not retroactive and they apply only to transfers that have occurred on or after April 4, 2020. All of the transfers at issue in this case that are the subjects of the state law claims occurred prior to that date. Accordingly, the state law claims that the Plan Administrator wishes to pursue are "fraudulent conveyance" claims that are governed by the terms of the NY DCL as they existed prior to the passage of the Uniform Voidable Transactions Act.

In this case, the Plan Administrator has asserted claims under a number of separate provisions of the NY DCL. These provisions differ in describing the creditors who may assert claims, and therefore they differ in the proof that the Plan Administrator must offer in order to show his entitlement to pursue such claims.

A.    **Claims Based on Alleged Insolvency – Section 273**

Section 273 of the NY DCL provides that every conveyance made and every obligation

incurred by a person "who is or will be thereby rendered insolvent" is fraudulent as to "creditors,"

without regard to intent, if the conveyance is made or the obligation is incurred without a "fair

consideration." NY DCL § 273. Section 273 refers to "creditors" generally, but unlike some other

provisions of the Debtor and Creditor Law section 273 does not specifically permit "future"

creditors to assert claims. New York courts have held that claims under section 273 may only be

asserted by persons who were creditors at the time of the challenged transfers. *See United Nat.*

*Funding, LLC v. Volkmann,* 25 Misc. 3d 1233(A), 906 N.Y.S.2d 776 (Sup. Ct. N.Y. Cty. 2009)

(permitting plaintiff's section 273 claim to survive a motion to dismiss because allegations

suggested that the plaintiff may have been a creditor when the transfers at issue were made); *see*

*also Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 277 B.R. 20, 35

(S.D.N.Y. 2002) (contrasting section 273 on the one hand and sections 275 and 276 on the other

and noting that the absence of the phrase "future creditors" in section 273 means that there must

be a "present creditor" at the time of the transfer (citing *In re 9281 Shore Road*, 187 B.R. 837, 851

(E.D.N.Y. 1995)). The Plan Administrator therefore may only pursue claims under section 273 if

he identifies one or more persons who held creditor claims at the time of the challenged transfers

*and* who continued to be creditors at the time the Debtor filed its chapter 11 bankruptcy petition.

The evidence at trial showed that Village Red's bankruptcy was precipitated by the filing

of claims by employees under the Fair Labor Standards Act and under other state and federal labor

laws. The claim of Albert Nieto covered amounts owed dating back to 2009, and the claim by

Valente Garcia covered amounts owed dating back to 2011. The claims ultimately were allowed

in the bankruptcy case and they were not paid in full. The Plan Administrator therefore has

established the existence of persons who were creditors prior to the transfers that are at issue in this case and who remained as unpaid creditors at the time of Village Red's bankruptcy filing. Accordingly, the Plan Administrator has standing to pursue claims under section 273.

### B.    Claims Based on Payments by Litigation Defendants – Section 273-A

Section 273-a of the NY DCL provides that "[e]very conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment." NY DCL § 273-a. Claims under section 273-a of the NY DCL were not separately discussed in the Joint Pretrial Order (which generally referenced claims under sections 270-276(a) of the Debtor and Creditor Law), but the Court asked about section 273-a at trial and the Plan Administrator indicated an intent to pursue claims under section 273-a. Defendants' counsel disputed the merits of the claim but did not object to the pursuit of the claim and did not contend that the claim was outside the bounds of the Complaint or the Joint Pretrial Order.

The evidence at trial proved that at least two lawsuits were filed against Village Red by former employees in the United States District Court for the Southern District of New York. One was filed by Valente Garcia and seven other plaintiffs on August 11, 2015 (Case No. 15 Civ. 6292) and the other was filed by Alberto Nieto on March 21, 2017 (Case No. 17-cv-02037). *See* PX 19, 20. The evidence also showed that the District Court granted a motion for summary judgment in the *Garcia* action on May 8, 2017, finding liability on the part of Village Red. The District Court proceedings to determine the amounts of plaintiffs' damages were not completed and were stayed

by the bankruptcy filing, but the plaintiffs filed proofs of claim in the Village Red bankruptcy case and the final allowed amounts of their claims were determined in the bankruptcy case.

The allowance of claims in favor of the employees in the *Garcia* action resolved all remaining issues between the parties to the litigation and was the equivalent of the entry of judgments with respect to the liabilities that were the subject of the District Court actions. *See In re Dow Corning Corp.*, 237 B.R. 380, 390-91 (Bankr. E.D. Mich. 1999). The allowed claims have not been paid in full. Accordingly, the Plan Administrator has standing to pursue claims under section 273-A, though such claims would only apply to transfers made on or after the earliest date on which the *Garcia* litigation was pending (August 11, 2015).

### C.    Claims Based on Unreasonably Small Capital – Section 274

Section 274 of the NY DCL provides that every conveyance made without fair consideration, at a time when the person making it "is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction, without regard to his actual intent." NY DCL § 274.[2] The Plan Administrator may pursue claims under section 274 if he identifies an unpaid creditor or creditors at the time of Village Red's bankruptcy filing so long as that person either was a creditor at the time of the challenged transfer or became a creditor "during the continuance of" a business for which unreasonably small capital allegedly existed. *See Official Comm. of Asbestos Claimants of G-I Holding, Inc.*, 277 B.R. at 36 (holding that creditors who did not have claims at the time of a transfer but who became creditors while the debtor continued to

---

[2]    At the outset of trial the Plan Administrator appeared to abandon this particular claim, but then referenced it at various times during the trial itself. For completeness the Court has addressed the claim in this Decision.

have unreasonably small capital were entitled to make claims under section 274); *Laco X-Ray Sys., Inc. v. Fingerhut*, 88 A.D.2d 425, 432, 453 N.Y.S.2d 757, 762 (1982) (noting that section 274 requires only that there was a creditor at some point in time at which the debtor had too little capital).

As explained above, the evidence showed that there were creditors of Village Red at the times of the relevant transfers who continued to be creditors at the time of the bankruptcy filings. Accordingly, there were creditors at the time of the challenged transfers and/or during the continuance of a business for which unreasonably small capital allegedly existed, and the Plan Administrator has standing to pursue claims under section 274.

**D.    Claims Alleging an Intent or Belief that Debts Would Not Be Paid as They Matured – Section 275**

Section 275 of the Debtor and Creditor Law states that "[e]very conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature" is fraudulent as to "both present and future creditors."  NY DCL § 275.  Since "future" creditors may make claims under section 275, the Plan Administrator may pursue such claims so long as Village Red had a single unpaid unsecured creditor at the time of its bankruptcy filing.  The evidence showed that this was the case and that the Plan Administrator therefore has standing to pursue claims under section 275.

**E.    Claims Alleging Actual Intent to Defraud – Section 276**

Section 276 of the NY DCL provided that "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."  NY DCL § 276.  Since "future" creditors may make claims under section 276, the Plan

15

Administrator may pursue such claims so long as Village Red had a single unpaid unsecured creditor at the time of its bankruptcy filing.  The evidence showed that this was the case and that the Plan Administrator therefore has standing to pursue claims under section 276.

**2.     Whether Serafis Provided Reasonably Equivalent Value or Fair Consideration for the Prepetition Transfers She Received**

A transfer is avoidable under various portions of section 548(a)(1)(B) of the Bankruptcy Code if, among other things, the debtor received less than reasonably equivalent value in exchange for the transfer.   11 U.S.C. § 548(a)(1)(B).   For this purpose, "value" means property, or satisfaction or securing of a present or antecedent debt of the debtor.  *Id*. § 548(d)(2)(A).   Under state law, a transfer is avoidable under sections 273 through 275 of the NY DCL if, among other things, the transfer is made without "fair consideration."   "Fair consideration" exists under the following circumstances:

> a.   When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

> b.   When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

NY DCL § 272.

The parties stipulate that Ms. Serafis received salary payments from 2012 through April 2018.   Services provided in return for salary payments are presumed to constitute "fair consideration" and "reasonably equivalent value" unless the Plan Administrator proves that the salary payments were made in bad faith or that they were "excessive" in light of Ms. Serafis's actual employment responsibilities.  *See Sama v. Mullaney (In re Wonderwork, Inc.)*, 611 B.R. 169, 208 (Bankr. S.D.N.Y. 2020); *Geron v. Craig (In re Direct Access Partners, LLC)*, 602 B.R. 495, 556-57 (Bankr. S.D.N.Y. 2019).

16

The extent to which Ms. Serafis provided any actual services to Village Red was the subject of summary judgment motions in the employee litigations that are referenced above.  In those actions, the plaintiff employees contended not only that Village Red was their "employer" but also that Nicholas Serafis and Christine Serafis should be treated as "employers" by virtue of their control and management of Village Red's operations.  Those claims were based on the definition of "employer" under the FLSA, which includes "any person acting directly or indirectly in the interest of an employer in relation to an employee."  *See* 29 U.S.C. § 203(d).  A similar argument was made as to liability under the New York Labor Law, which uses a similarly expansive definition of the term "employer."  *See* N.Y. Lab. Law § 190(3).

The Court of Appeals for the Second Circuit has ruled that the "economic reality" of the parties' relationship governs the determination of whether an individual is an "employer" under the FLSA.  *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984).  A "non-exclusive" list of factors to be considered in determining that issue is "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."  *Id.*  Evidence of "an individual's authority over management, supervision and oversight of a company's affairs" also is relevant in determining the individual's operational control of the company's employment of the plaintiff employees.  *Irizarry v. Catsimatidis*, 722 F.3d 99, 110 (2d Cir. 2013).

In 2017, Ms. Serafis filed a motion for summary judgment as to the allegations that she should be treated as an "employer" for purposes of the wage claims against Village Red.  In support of that motion she submitted a sworn affidavit dated January 17, 2017 that confirmed that she had

no role in the management and operation of Village Red. *See* PX 24. She stated in the affidavit, among other things, that:

- Nicholas Serafis put the stock of Village Red in his daughter's name "solely for estate tax purposes" and as a gift, for which Ms. Serafis provided no consideration. *Id.* ¶ 4.

- Ms. Serafis asked what she would have to do as owner of the business, and her father answered that she "did not have to do anything." Instead, Nicholas Serafis "would continue to operate the business the same as before," and that Ms. Serafis could continue to live in Greece while her father ran the restaurant. *Id.* ¶¶ 7-8.

- Ms. Serafis "did not assume any duties or responsibilities concerning the operation, control or management of the Restaurant." *Id.* ¶ 9.

- Ms. Serafis "never worked at the Restaurant," only visited it 8 or 10 times (mainly to see her father), and had "no knowledge of anything that is done at the Restaurant, either by my father, by any members of management, or by any of the employees." *Id.* ¶ 10.

- Nicholas Serafis made "all decisions concerning the employees of the Restaurant" and the restaurant belonged to Ms. Serafis "in name only . . ." *Id.* ¶¶ 12-14.

- Ms. Serafis received a salary, but "it was solely my father's decision whether to pay me a salary and how much it should be. I did not ask to be paid. He could change the amount I receive or stop my payments entirely, and I would not complain. He had full authority to do as he pleased." *Id.* ¶ 14.

- Although Ms. Serafis's signature was used for checks and other matters, her father used a rubber signature stamp containing her name, and never consulted her about its use. *Id.* ¶ 17.

18

A supporting affidavit of John Captan dated January 26, 2017 was also submitted in support of Ms. Serafis's motion. (PX 25.) Mr. Captan confirmed that Ms. Serafis had never worked at Village Red "in any capacity." *Id.* ¶ 5. Nicholas Serafis submitted a separate affidavit (PX 26) confirming that he was the "actual" owner of Village Red and that Ms. Serafis took "absolutely no part in what goes on" at the restaurant. *Id.* ¶¶ 4, 13.

Based on the foregoing, the District Court dismissed the FLSA and New York Labor Law claims against Ms. Serafis. (PX 27.) The District Court noted that some individual operational control over a business is necessary to support liability as an employer, and that Ms. Serafis had never exercised any such authority. *Id.* at 11.

Ms. Serafis's sworn affidavit in the District Court action, and her motion papers and other affidavits that she offered, make clear that she provided no actual managerial or other services to Village Red prior to 2017 and that the "salary" payments that were paid to her were, in fact, payments that were made without any consideration at all. Although the affidavit and motion papers only covered the time period through early 2017, Ms. Serafis testified at trial in this matter that her role with respect to the restaurant remained the same until after the bankruptcy filing in April 2018. When Mr. Serafis became ill in 2017, his duties were transferred to Mr. Captan and were handled by Mr. Captan (not Ms. Serafis), and Ms. Serafis did not become more involved until after the bankruptcy filing. Mr. Captan confirmed during his own testimony that Ms. Serafis never supervised his work in any way until 2018.

Serafis argued at trial that as the owner of Village Red her name was held out as the legal owner of the business, that her signature was required for all business matters; and that she gave her personal guaranty to certain vendors, with the result that her credit was at risk. She also argued that as an owner she was exposed to personal liability for sales, withholding taxes and other

business matters.    However, none of that constitutes "reasonably equivalent value" or "fair consideration" for the purported salary payments that she received.  Ms. Serafis provided no actual services in return for the salary payments.  She also provided no "property" (tangible or otherwise) in exchange for those payments, and the payments were not made in satisfaction of antecedent debts.

Ms. Serafis owned a business, but that equity ownership did not entitle her to salary payments.  An owner's rights to receive returns are features of equity ownership that are junior to the rights of creditors.  If the business had been solvent then Ms. Serafis might have been entitled to dividend payments with respect to her equity position, but by definition dividend payments are payments that are made in respect of equity investments; they are not made in exchange for property or in payment of antecedent debts, and therefore they are not made in exchange for "fair consideration" or "reasonably equivalent value."  *See Sherman v. FSC Realty LLC (In re Brentwood-Lexford Partners, LLC)*, 292 B.R. 255, 267 (Bankr. N.D. Tex. 2003) (holding that dividends, or "salary" payments that functioned as dividends and not as reasonable compensation for actual services, are just distributions to equity holders for which a company does not receive reasonably equivalent value); *Fisher v. Hamilton (In re Teknek, LLC)*, 343 B.R. 850, 861 (Bankr. N.D. Ill. 2006) (distribution of profits to an owner that is not in actual consideration for earned salary is a transfer without reasonably equivalent value).  Ms. Serafis' position as the equity owner did not constitute "reasonably equivalent value" or "fair consideration" for any of the prepetition salary payments that were made to her.

Similarly, the fact that the ownership of Village Red included some risk of tax liability was just a feature and a risk of equity ownership.  It did not constitute consideration for the salary payments that were made to Ms. Serafis.  Finally, it may have been wise for Ms. Serafis to protect

her equity interests in Village Red by guaranteeing some of Village Red's obligations, but that was a financial undertaking. It does not mean she was entitled to a salary or that she provided "consideration" or "reasonably equivalent value" for salary payments.

In any event, no evidence was offered as to any specific guarantees that were made by Ms. Serafis, or as to any particular risks that Ms. Serafis allegedly faced by virtue of her ownership of Village Red. The record shows that Ms. Serafis was a defendant in a suit filed by employees, but she was dismissed from that suit without any liability. The mere fact that an owner might be accused of exercising operational control of a business does not justify the payment of a salary when, by the owner's own admission, the owner does not actually exercise any such control.

I find based on the record at trial that Ms. Serafis provided no actual services, property or other consideration in exchange for the salary payments that were made to her prior to the filing of Village Red's bankruptcy case. The salary payments were in fact gratuitous payments to an owner, for which Village Red received nothing of value in exchange.

At one point during the trial, Ms. Serafis's counsel suggested that Mr. Serafis had provided services and that the total payments to Ms. Serafis and to Mr. Serafis somehow should be combined, and compared to the value of Mr. Serafis's services, in deciding whether fair consideration or reasonably equivalent value was provided. I know of no authority for such an approach, and none has been cited. In any event, there was no evidence as to just what compensation Mr. Serafis received (not only in the form of salary but in the form of other payments he might have taken from the business), and so the evidence would not justify a finding in favor of the defendant even if this theory could be indulged.

The dividend payments that were made in late 2017 similarly were made without fair consideration or the provision of reasonably equivalent value. As noted above, a dividend payment

is by definition a distribution with respect to an owner's equity interest.  *See State v. First Investors Corp.*, 156 Misc. 2d 209, 216, 592 N.Y.S.2d 561, 567 (Sup. Ct. N.Y. Cnty. 1992) (holding that the payment of a dividend is a conveyance without fair consideration for purposes of the NY DCL); *see also WestLinn Paper Co. v. BTC-USA Inc.*, No. 13-1678, 2014 U.S. Dist. LEXIS 161747 at *19 (D. Minn. 2014)("[a]s to the dividend payments, however, there can be no evidence of reasonably equivalent value because a dividend payment is by its nature not an exchange for value"); *CLC Creditors' Grantor Trust v. Howard Sav. Bank (In re Commercial Loan Corp.)*, 396 B.R. 730, 746 (Bankr. N.D. Ill. 2008) (dividends are payments for which a company does not receive reasonably equivalent value); *Official Unsecured Creditors Comm. v. Microdot (In re Valley-Vulcan Mold)*, No. 91-4056, 1994 Bankr. LEXIS 2347 *22 (Bankr. N.D. Oh. 1994) (a dividend is a return on capital that by its terms is not made in exchange for valuable consideration). There was no contention at trial that the "dividend" payments in this case were in fact anything other than gratuitous distributions to an owner.  The dividend payments were not made in exchange for property or services and they were not made in satisfaction of any antecedent debts.

Accordingly, I find that all of the challenged pre-petition transfers to Serafis were made without the receipt of fair consideration or reasonably equivalent value in exchange.

**3.    Whether the Prepetition Transfers to Christine Serafis Are Avoidable**

**A.    Whether Village Red Was Insolvent When the Transfers Were Made**

The solvency of Village Red is relevant both as to the Plan Administrator's claims under section 548 of the Bankruptcy Code and section 273 of the NY DCL.  "Insolvency," for purposes of section 548 of the Bankruptcy Code, is determined by comparing the sum of an entity's debts to a fair valuation of its assets.  *Tronox v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239, 296 (Bankr. S.D.N.Y. 2013).  New York law similarly provides that a person is insolvent when

"the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." NY DCL § 271(1); *Tese-Milner v. Edidin & Assocs. (In re Operations NY LLC)*, 490 B.R. 84, 97 (Bankr. S.D.N.Y. 2013). For this purpose, "assets" include all property that is not exempt from liability for the payment of debts, and "debts" include "any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." NY DCL § 270.

The solvency of a business is usually calculated based on the revenues that the business may generate as a going concern, and not based on the present liquidation value of its assets. *See Comm. of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 344 (Bankr. S.D.N.Y. 2007); *In re PWS Holding Corp.*, 228 F.3d 224, 233 (3d Cir. 2000). Solvency should be measured on a going concern basis unless the demise of the business is so clearly imminent that the business is incapable of generating any ongoing revenues. *See, e.g., In re Trans World Airlines, Inc.*, 134 F.3d 188, 193 (3d Cir. 1998); *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1067 (3rd Cir. 1992) (proper to use sale values that presumed a going concern unless bankruptcy was "clearly imminent"); *In re Taxman Clothing Co.*, 905 F.2d 166, 170 (7th Cir. 1990) (going concern valuation should be used unless the "business is on its deathbed"); *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.)*, 100 B.R. 127, 131 (Bankr. D. Mass. 1989) (holding that solvency is to be measured by the going concern value of a business and "not the liquidation value of its assets less its liabilities"); *Fryman v. Century Factors, Factor for New Wave (In re Art Shirt Ltd.)*, 93 B.R. 333, 341 (E.D. Pa. 1988) (going concern values should be used unless a company is "on its deathbed").

A plaintiff ordinarily bears the burden to prove "insolvency" for purposes of proving a claim under section 273 of the NY DCL. *See Direct Access Partners*, 602 B.R. at 548; *Deflora*

23

*Lake Dev. Assocs., Inc. v. Hyde Park*, No. 13-CV-4811, 2016 WL 7839191, at *3 (S.D.N.Y. June

9, 2016) (the party challenging a conveyance under section 273 has to show insolvency) (quoting

*Joslin v. Lopez*, 309 A.D.2d 837, 838 765 N.Y.S.2d 895, 897 (2d Dep't 2003)); *Atateks Foreign*

*Trade Ltd. v. Dente*, 2017 WL 4221085, at *5 (S.D.N.Y. Sept. 22, 2017) (elements of NY DCL

Section 273 and 274 must be proved by the plaintiff).  However, if a plaintiff shows that a transfer

has been made without fair consideration there is a rebuttable presumption of insolvency under

New York law that shifts the burden to the defendant to offer evidence of solvency at the time of

the transaction and immediately thereafter.  *Geo-Grp. Commc'ns, Inc. v. Chopra*, No. 15 CIV.

1756 (KPF), 2016 WL 390089, at *7 (S.D.N.Y. Feb. 1, 2016) (considering the issue at the pleading

stage); *Geron v. Shulman (In re Manshul Constr. Corp.)*, No. 97 Civ. 8851 (JGK), 2000 U.S. Dist.

LEXIS 12576 at *150 (S.D.N.Y. Aug. 30, 2000); *Official Comm. of Unsecured Creditors of Vivaro*

*Corp. v. Leucadia Nat'l Corp. (In re Vivaro Corp.)*, 524 B.R. 536, 551, 553 (Bankr. S.D.N.Y.

2015); *Battlefield Freedom Wash, LLC v. Song Yan Zhuo*, 148 A.D.3d 969, 971 (2d Dep't 2017);

*Wimbledon Fin. Master Fund, Ltd. v. Bergstein*, No. 150584/2016, 2017 N.Y. Misc. LEXIS 2713

*8 (Sup. Ct. N.Y. Co. July 17, 2017).

I note that some federal courts in New York have applied a similar presumption of

insolvency under section 548(a)(1)(B)(ii)(I) of the Bankruptcy Code where a plaintiff proves that

a transfer was made without reasonably equivalent value.  The decisions of which we are aware

all seem to trace back to the decision in *Mendelsohn v. Jacobowitz (In re Jacobs)*, 394 B.R. 646,

672 (Bankr. E.D.N.Y. 2008), which cited the New York rule and then applied that presumption

(without any further discussion) both to claims under section 273 of the Debtor and Creditor Law

and claims under section 548 of the Bankruptcy Code.  *Id*. at 673.  A later decision cited

*Mendelsohn* for the proposition that the New York presumption of insolvency "has been applied

to constructive fraudulent transfer litigation under 11 U.S.C. § 548." *See In re Operations NY LLC*, 490 B.R. at 98. At least one other decision then cited *In re Operations NY LLC* for the same proposition. *See McCord v. Ally Fin., Inc. (In re USA United Fleet, Inc.),* 559 B.R. 41, 79 (Bankr. E.D.N.Y. 2016) (*citing In re Operations NY LLC* for the proposition that the New York presumption "has been applied to constructive fraudulent transfer litigation under 11 U.S.C. § 548").

The foregoing decisions are not convincing. Congress set forth a time-limited presumption of insolvency in connection with preference recoveries under section 547 of the Bankruptcy Code, but no similar presumption appears in section 548(a)(1)(B)(ii)(I), which governs the avoidance of transfers made without reasonably equivalent value while a debtor is insolvent. In addition, the presumption of insolvency that is available under section 273 of the NY DCL is based on a long history of New York court decisions that have verified that presumption as a matter of New York law. I am not aware of any similar line of authority with respect to presumptions of insolvency under section 548 of the Bankruptcy Code. The few cases cited above that have applied the presumption in this context have done so without any analysis of whether the New York presumption should also be applicable to a claim under section 548. Furthermore, while the Plan Administrator has argued in this case that a presumption of insolvency is applicable to the claims under section 273, he has made no such argument as to section 548. Perhaps further argument in a future case might convince me to the contrary, but based on the positions taken by the Plan Administrator I will not apply the New York presumption of insolvency to the claims under section 548(a)(1)(B)(ii)(I).

The evidence at trial about Village Red's actual financial condition was very thin. The Plan Administrator offered evidence that Village Red listed few assets and that its known

liabilities exceeded the value of its assets when it filed for bankruptcy. However, that does not prove solvency or insolvency as of prior dates. Insolvency is relevant only if it existed on the date(s) on which the challenged transfers occurred, and it "cannot be presumed from subsequent insolvency at a later point in time." *O'Toole v. Karnani (In re Trinsum Grp.)*, 460 B.R. 379, 392 (Bankr. S.D.N.Y. 2011).

No documents were offered into evidence as to the profits or losses generated by Village Red on an ongoing basis. The Plan Administrator testified that based on Village Red's reported post-bankruptcy operating results it would have taken forty years to repay the employee debts, but no specifics were offered, and no evidence was offered to compare the post-petition operating results with the pre-petition operations. The Plan Administrator testified on cross-examination that he had seen prior tax filings but they were not offered into evidence. The Plan Administrator also testified that he understood that Village Red was not very profitable but that it had reported some profit in at least 2017, though no specifics were provided or as to whether all expenses has properly been counted. There was vague evidence at trial to the effect that Village Red paid $11,000 in rent (and not the specified $25,000) because it could not afford to pay more. However, the Plan Administrator has also argued that $11,000 was the "real" agreed-upon rent. The vague testimony about the reasons why $11,000 was actually paid was not sufficient to prove insolvency.

The evidence showed that employees had claims under various labor laws that accrued beginning in 2009 and that ultimately were allowed in the total amount of $5,347,616.81. Village Red's inability to pay those claims in 2017 was cited explicitly as the reason for its bankruptcy filing. However, no evidence was offered by either party as to the amounts of such

liabilities at various times, or as to whether Village Red had sufficient value to cover these and other liabilities at various times.

For her part, Ms. Serafis offered no meaningful evidence as to Village Red's financial condition. Her counsel elicited testimony to the effect that Village Red had "gross receipts" of approximately $2,193,000 in 2016, but "gross receipts" is a meaningless figure without consideration of the expenses that must be paid.

Whether the evidence showed that Village Red was solvent or insolvent therefore depends on the application of relevant presumptions and the burden of proof. If the Plan Administrator bore the burden to prove insolvency, he failed to carry it. If insolvency is presumed and if Ms. Serafis bore the burden to offer evidence to the contrary, she failed to do so. I find for the reasons stated above that insolvency is not presumed for purposes of the claims under section 548 of the Bankruptcy Code and that the Plan Administrator failed to carry his burden to prove insolvency for purposes of those claims. However, since I have found that the prepetition payments to Ms. Serafis were made without fair consideration, there is a rebuttable presumption (for purposes of the New York state law claims) that Village Red was insolvent at the times of those transfers. It was Ms. Serafis's burden to offer evidence of solvency in rebuttal of that presumption, and she failed to do so. I therefore find that Village Red was insolvent at the times of the challenged pre-petition transfers for purposes of the claims under section 273 of the NY DCL. The Plan Administrator has the right to recover all of the identified prepetition transfers to Ms. Serafis pursuant to sections 544 and 550 of the Bankruptcy Code and section 273 of the NY DCL.

### B.        Whether Transfers Were Made While Litigation Was Pending

The evidence plainly showed that lawsuits were pending against Village Red from as

early as August 11, 2015; that while the lawsuits were pending transfers were made by Village

Red to Serafis without fair consideration; that the District Court ruled that Village Red was liable

to the plaintiffs in the pending lawsuits; that the amounts of those liabilities have been

determined in Village Red's bankruptcy case; and that the allowed claims have not been paid.

The Plan Administrator therefore has the right to recover all of the prepetition transfers that were

made to Serafis from and after August 11, 2015 pursuant to sections 544 and 550 of the

Bankruptcy Code and section 273-a of the NY DCL.  Those claims, however, merely make up a

sub-set of the transfers that the Court has found to be recoverable under section 273.

### C.        Whether the Debtors Had Unreasonably Small Capital at the Relevant Times

In order to recover transfers pursuant to DCL § 274 and/or Bankruptcy Code

§548(a)(1)(B)(ii)(II) the Plan Administrator must show that, at the time of the transfers, Village

Red was engaged in or about to engage in a business or a transaction that would leave it with

unreasonably small capital.  *In re Operations NY LLC,* 490 B.R. at 98.  This test denotes a

financial condition short of actual insolvency and "is aimed at transferees that leave the

transferor technically solvent but doomed to fail."  *Id*. (citing *MFS/Sun Life Trust-High Yield

Series v. Van Dusen Airport Services Co.*), 910 F. Supp. 913, 944 (S.D.N.Y. 1995).  A debtor has

"unreasonably small" assets if insolvency is inevitable in the reasonably foreseeable future.

*Adelphia Recovery Trust v. FPL Grp., Inc. (In re Adelphia Communs. Corp.)*, 652 F. App'x 19,

21 (2d Cir. 2016).  Factors that may be relevant in determining whether capital was unreasonably

small include the transferor's debt to equity ratio, its historical capital cushion, and the need for

working capital in the transferor's industry.  *In re Vivaro Corp.*, 524 B.R. at 551; *In re Taubman*, 160 B.R. 964, 986 (Bankr. S.D. Ohio 1993).

The most important consideration in determining whether a business has unreasonably small capital is whether the business has or can generate resources from its operations or from asset sales to sustain its operations.  *Moody*, 971 F.2d at 1070 ("unreasonably small capital" is a situation marked by the "inability to generate sufficient profits to sustain operations"); *In re Vadnais Lumber Supply, Inc.*, 100 B.R. at 137 (Courts look "to the ability of the debtor to generate enough cash from operations or asset sales to pay its debts and still sustain itself."). The fact that a business actually survived for a considerable period of time after a challenged transfer is a factor that a court may consider in deciding whether the business had unreasonably low capital at the time of the transfer.  *See Moody,* 971 F.2d at 1074; *Daley v. J.F. Chang (In re Joy Recovery Tech. Corp.)*, 286 B.R. 54, 76 (Bankr. N.D. Ill. 2002).  However, it is only one of many factors that may be relevant, and is not necessarily controlling.  *In re Tronox, Inc.*, 503 B.R. at 322.

No presumptions are applicable with respect to the Plan Administrator's claims that the Debtors had "unreasonably small capital."  It is the Plan Administrator's burden to prove such contentions.  *See In re Vivaro Corp.*, 524 B.R. at 551.

No actual proof of the results of Village Red's ongoing operating results ever was offered. I conclude that the Plan Administrator failed to carry his burden to prove that the Debtors had unreasonably small capital.

### D.    Whether the Debtors Made Transfers Knowing They Could Not Repay Debts

A transfer is avoidable under section 548(a)(1)(B)(ii)(III) of the Bankruptcy Code if it was made within two years prior to the filing of the bankruptcy petition, if it was made without

receiving reasonably equivalent value in return, and if the debtor "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured." 11 U.S.C. § 548(a)(1)(B)(ii)(III). Intent or belief must be proved, though they may be inferred from other circumstances. *See Official Comm. of Unsecured Creds. of Tousa, Inc. v. Citicorp of North Am., Inc. (In re TOUSA, Inc.)*, 422 B.R. 783, 862-63 (Bankr. S.D. Fla. 2009). Section 275 of the NY DCL similarly provides that a transfer is fraudulent if it is made without fair consideration at a time when the transferor intended to incur, or believed that it was incurring, debts that would be beyond its ability to pay as they matured. In order to prove a claim under section 275, the Plan Administrator must show that at the time of each challenged transfer the controlling persons at Village Red had a subjective belief that Village Red was incurring or would incur debts beyond its ability to pay as they matured. *See In re Best Prods. Co.*, 168 B.R. 35, 52-53 (Bankr. S.D.N.Y. 1994), *aff'd*, 68 F.3d 26 (2d Cir.1995); *see also Grace Plaza of Great Neck, Inc. v. Heitzler*, 2 A.D.3d 780, 781, 770 N.Y.S.2d 421, 423 (2d Dep't 2003) (Pursuant to NY DCL § 275, a conveyance made by a person who has a "good indication of oncoming insolvency" is deemed to be fraudulent); *Kramer v. Chin (In re Louise Chin)*, 492 B.R. 117, 129 (E.D.N.Y. Bankr. 2013) (section 275 requires proof of awareness by the transferor that, as result of the conveyance, he will not be able to pay present and future debts). So far as we are aware, the New York courts have not adopted any presumptions with regard to such claims, and the burden of proof rests with the Plan Administrator.

The Plan Administrator failed to prove that Village Red made transfers at a time when it actually believed or intended that it was incurring debts that it would be unable to pay. No evidence was offered as to the subjective beliefs of Mr. Serafis or of others in this regard, and no facts were offered in evidence that were sufficient to support the implication that Village Red

actually intended or believed that it would be unable to pay claims as they matured.  I conclude

that the Plan Administrator failed to carry his burden of proof with respect to this issue.

> ### E.    Whether Village Red Made Transfers With the Actual Intend to Defraud, Hinder or Delay Creditors

The Plan Administrator has argued that the prepetition transfers were made with actual

intend to defraud, hinder or delay creditors and therefore that they are avoidable under section

548(a)(1)(A) of the Bankruptcy Code and/or section 276 of the NY DCL.  Although this claim

was preserved in the papers and in the Joint Pretrial Order, it was not even clear at trial whether

the Plan Administrator was still pursuing it.  It does not matter, however, because the evidence

failed to show any actual fraudulent intent in connection with any of the prepetition transfers.

## 4.    Ms. Serafis's Offset Defense

Ms. Serafis contends that she is the sole owner of 135 Waverly and that in that capacity

she should be able to offset any prepetition sums owed to 135 Waverly against any liability she

personally has to repay the prepetition transfers that she received.  There are two reasons why

this contention is incorrect.  First, for the reasons set forth below I have found that 135 Waverly

is not entitled to the assertion of an unsecured claim, so there is no debt owing to 135 Waverly

that could be the basis for an offset.  Second, and more importantly, Ms. Serafis's position is

simply wrong as a matter of law.

The creditor who asserts an offset defense must establish that (1) the debtor owed a debt

to the creditor that arose pre-petition; (2) the debtor must have a claim against the creditor that

arose pre-petition; and (3) the debt and the claim are mutual.  *See In re Manshul Constr. Corp.*,

2000 U.S. Dist. LEXIS 12576, at *159-160.  Here, 135 Waverly was a separate legal entity.  *See*

*New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 442 (1934) ("[a]s a general rule a corporation

and its stockholders are deemed separate entities"); N.Y. Limited Liability Company law § 601

31

("A membership interest in the limited liability is personal property. A member has no interest in specific property of the limited liability company."). Any rent obligation that was allegedly owed to 135 Waverly was not a debt owed directly to Ms. Serafis. There was no mutuality, and therefore there could be no right to an offset. *See MNC Comm. Corp. v. Joseph T. Ryerson & Son, Inc.*, 882 F.2d 615, 618 n. 2 (2d Cir. 1989).

Furthermore, even if the rent obligation had been owed to Ms. Serafis directly it still would not have entitled her to assert an offset defense. Courts have consistently held that the obligation to repay a fraudulent transfer is a debt that is owed to the trustee (or, in this case, to the Plan Administrator) pursuant to sections 544 and 550 of the Bankruptcy Code. The obligation under section 550 is not a prepetition obligation that was owed directly to Village Red, and as a matter of equity it may not be offset against other obligations owed by Village Red. *See In re Manshul Constr. Corp.*, 2000 U.S. Dist. LEXIS 12576 at *160-161; *Kramer v. Sooklall (In re Singh)*, 434 B.R. 298, 308 (Bankr. E.D.N.Y. 2010); *Balabar-Strauss v. GTE Supply (In re Coin Phones, Inc.)*, 153 B.R. 135, 143 (Bankr. S.D.N.Y. 1993); *Hassett v. Far West Fed. Sav. & Loan Ass'n (In re O.P.M. Leasing Services, Inc.)*, 40 B.R. 380, 402 (Bankr. S.D.N.Y. 1984).

For each of the foregoing reasons the asserted offset defense is not available to Ms. Serafis.

**5.    Whether the Challenged Post-Petition Payments Are Avoidable**

The Bankruptcy Code requires court approval for any use of a Debtor's assets other than transactions made in the ordinary course of business. *See* 11 U.S.C. §§ 363(b) and (c). If a debtor makes transfers of property that are not authorized by the court and not otherwise authorized by the Bankruptcy Code then the transfers are avoidable pursuant to section 549 of

32

the Bankruptcy Code. *See* 11 U.S.C. § 549. The Plan Administrator's claims under section 549 were filed less than two years after the transfers that are being challenged and those claims are timely under section 549(d). *Id.*

The defendants contend that the post-petition salary payments that were paid to Ms. Serafis, and the increased post-petition rent that was paid to 135 Waverly, were paid in the ordinary course of business and were valid under sections 363 and 549 of the Bankruptcy Code. Rule 6001 of the Federal Rules of Bankruptcy Procedure provides that the defendants, as the parties asserting the validity of the transfers, have the burden to proof that the transfers were proper and authorized. *See* Fed. R. Bankr. P. 6001.

The term "ordinary course of business" is not defined in the Bankruptcy Code but it is used in a number of different provisions. *See, e.g.,* 11 U.S.C. § 363 (b) and (c) (requiring court approval of transactions that are not in the ordinary course of business but permitting uses of property in the ordinary course of business); § 364(a) (permitting a debtor operating a business to obtain unsecured credit and to incur unsecured debt in the ordinary course of business); § 503(c)(3) (providing that a court may not allow, as administrative expenses, transfers or obligations "that are outside the ordinary course of business and not justified by the facts and circumstances of the case"); § 547(c)(2) (providing a defense to preference claims if, among other things, a transfer was made in the ordinary course of business); § 548(a)(1)(B)(ii)(IV) (providing that transfers made to an insider pursuant to an employment contract and not in the ordinary course of business, for which a debtor does not receive reasonably equivalent value in exchange, are constructively fraudulent as to creditors); § 744 (setting time limits in a stockbroker liquidation case for the assumption or rejection of a contract to purchase or sell a security in the ordinary course of the debtor's business); § 1301 (staying actions against co-

33

debtors in chapter 13 cases unless the co-debtor became obligated on the debt in the ordinary course of business). In general, the purpose of the various "ordinary course" provisions is to leave undisturbed certain normal financial relations between a debtor and other parties. *Montgomery Ward, LLC v. OTC Int'l Ltd. (In re Montgomery Ward, LLC)*, 348 B.R. 662, 673 (Bankr. D. Del. 2006).

Courts have used two tests in determining whether a transaction was in the ordinary course of business under section 363: a "horizontal dimension" test and a "vertical dimension" test. *See Committee of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616-618 (Bankr. S.D.N.Y. 1986). The "horizontal dimension" test considers whether a transaction is one that would normally be entered into by a similar business as a matter of routine. *Id.* at 618. The purpose is to determine whether a transaction of the kind before the court is an abnormal or unusual one rather than a reasonably common one. Village Red's sales to customers at its restaurant, for example, were transactions that were made in the regular course of business. Similarly, its regular ordering of restaurant supplies were common and ordinary features of operating a restaurant.

The "vertical dimension" test considers whether transactions were of a type that creditors would expect to have been made in the ordinary course of business. *Manville*, 60 B.R. at 616-17. The vertical test assesses whether a creditor would have expected the debtor to enter into the transaction at issue and whether the transaction exposes creditors to risks that differ from those they accepted when they extended credit. *Id.* at 616. For this purpose, "the touchstone of 'ordinariness' is the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business." *Armstrong World Inds., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.*), 29 B.R. 391, 394 (S.D.N.Y. 1983). Certain

34

transactions may be necessary to the conduct of a business but they cannot be considered "ordinary" transactions due to their size, nature or both. *Johnston v. First Street Companies, Inc. (In re Waterfront Companies, Inc.)*, 56 B.R. 31, 34-35 (D. Minn. 1985).

The Bankruptcy Code permits "ordinary course" transactions without court approval because they simply reflect the ongoing nature of a debtor's usual business and because they do not implicate any of the creditor protections or other principles that the Bankruptcy Code is designed to protect. The key, no matter which test is used, is to distinguish between routine operations (which a debtor can pursue without the need for individualized court approval) and transactions that are sufficiently unusual, unique or significant from the perspective of creditors that they require court approval. The freedom to conduct "ordinary course" transactions cannot be used to permit uses of property of an estate that are "inimical to the theory and philosophy of the Bankruptcy Code." *See Pressman v. Bank of St. Louis (In re J.T.L., Inc.)*, 36 B.R. 860, 862 (Bankr. E.D. Mo. 1984).

The evidence a trial showed that the post-petition salary payments to Ms. Serafis, and the increased rent payments to 135 Waverly, were not "ordinary" transactions at all. In fact, I find it difficult to imagine transactions that would be less qualified for characterization as "ordinary course of business" transactions that did not require court approval.

## A.    Post-Petition Salary Payments to Serafis

The parties have stipulated that, beginning April 25, 2018, Ms. Serafis was paid $2,000 per week in salary payments. The Plan Administrator asserted in the Joint Pretrial Order that the total amount at issue was $56,000 "consisting of $2,000/week received by Ms. Serafis beginning on April 25, 2018 to the Confirmation Date." *See* Joint Pretrial Order at 17. In this case, the confirmation date was October 17, 2019. *See* Confirmation Order [Case No. 18-10960, ECF No.

72.]  At the conclusion of the trial, the Plan Administrator argued that the figure set forth in the

Joint Pretrial Order was a typographical error and that the actual amount at issue was $154,000.

Ms. Serafis's counsel did not object to the correction and agreed that a salary of $2,000 per week

had been paid.  If $2,000 was paid weekly beginning April 25 then by the Court's calculations a

total of $156,000 would have been paid through and including October 16, 2017, but perhaps the

Plan Administrator treated an October 16, 2017 payment as a post-confirmation transaction.  In

any event, given the parties' agreement that $2,000 per week was paid throughout the designated

period, the Court will accept the Plan Administrator's correction of the figures, so that the amount

at issue is $154,000 rather than $56,000.

No court approval of these payments was sought or obtained.  Ms. Serafis argues that the

payment of wages and salaries to employees is part of a company's ordinary business and that no

Court approval was required.  Certainly it is true that the payment of ordinary wages to employees

is part of a company's ordinary course of business.  However, I have already determined that the

pre-petition salary payments were without consideration and were not made in exchange for actual

services.  Furthermore, an immediate and large salary increase, paid by a relatively small company

just after a bankruptcy filing to a person who is also the owner of the company, is not an "ordinary"

employment transaction in the sense envisioned by section 363 of the Bankruptcy Code.  It may

be "ordinary" and routine for a business to negotiate wages with employees on an arm's-length

basis, but in this instance the sole owner (Ms. Serafis) effectively controlled both sides of the salary

negotiation.  There was nothing "ordinary" or "routine" in an owner's unilateral decision as to how

much money to take from a bankrupt company in the form of a post-petition salary.

In addition, creditors are entitled to priority in bankruptcy.  An equity owner's decision to

pay herself an increased salary (at the expense of the bankrupt company and therefore at the

36

expense of creditors) is something that creditors reasonably should expect will require court approval. Transactions with insiders are subject to careful scrutiny in bankruptcy, and any proposed increase in salary payments to Ms. Serafis should only have occurred following a proper request for court approval.

Instead of seeking court approval for the salary payments, Village Red effectively downplayed them. Village Red was required to file regular monthly Operating Reports that required the separate identification of any payments that Village Red made to "insiders." The operating reports listed the salary payments to Ms. Serafis in the "payroll detail" sections, but they failed to identify those as payments to "insiders" as the forms required. Instead, the forms represented that no payments to insiders had been made. Persons who reviewed the reports would not have known that "insider" payments were being made unless they disregarded the "insider" disclosures in the forms and instead combed through the line-item details to discover the payments to Ms. Serafis, as the NLRB eventually did.

Ms. Serafis's counsel argued that the salary increase was reasonable but the evidence did not support that contention. To the contrary: the evidence showed that the payments were excessive and improper. Ms. Serafis testified that she devoted more of her own time and attention to the business after the bankruptcy filing than she previously had. However, she also confirmed that she continued to spend approximately 80% of her time in Greece. The Disclosure Statement suggested to creditors that the actual management of the business was handled by Nicholas Serafis and by John Captan and that they were paid $15 per hour for their services. *See* Amended Disclosure Statement [Case No. 18-10960, ECF No. 60 at pdf p. 7.] The only mention of salary payments to Christine Serafis in the Disclosure Statement were a reference to the possibility that Village Red made unauthorized payments to her. *Id*. at pdf pp. 4, 9. By all

accounts Mr. Captan and Mr. Serafis performed duties that were far more significant than any work provided by Ms. Serafis. At the rate of $15 per hour (the rate listed for payments to the actual managers of the business), Ms. Serafis would have needed to work more than 133 hours per week to justify compensation of $2,000 per week, and she plainly never did so.

I find that the increased post-petition salary payments to Ms. Serafis were not agreed to in the ordinary course of business and were not paid in the ordinary course of business. There was nothing arm's-length or routine about them. Instead, they were self-dealing transactions that were designed to divert value to the equity owner (Ms. Serafis) on terms that should have been presented to the Court and that would not have been approved if they had been presented.

The Plan Administrator has sought to recover the full amounts of the post-petition salary payments to Ms. Serafis. In response, Ms. Serafis has argued that the full payments were appropriate, which is a contention that I have rejected for the reasons stated above. Neither party addressed the question of whether some smaller level of compensation would have been appropriate on a post-petition basis and therefore whether Ms. Serafis should only be liable for the return of the "excess" payments, rather than for the return of the entire amounts of the post-petition salary payments. Some courts have held, on equitable grounds, that only the "excess" amounts should be recovered under sections 549 and 550. *See 5* COLLIER ON BANKRUPTCY ¶ 550.02 (16th ed. 2021); *Ossen v. Bernatovich (Matter of National Safe Northeast, Inc.),* 76 B.R. 896, 906-07 (Bankr. D. Conn. 1987) (finding salary payments were excessive and unauthorized but permitting recovery of only 75% of the payments). If Ms. Serafis wanted some equitable reduction based on the "real" value of services that she provided, however, it was her burden under Rule 6001 to offer evidence that would permit the Court to calculate the actual value of her services. *See* Fed. R. Bankr. P. 6001. She did not do so. Ms. Serafis made many of the

same arguments that she made about the purported justifications for her pre-petition salary payments, which I have rejected for the reasons stated above. She also offered vague testimony to the effect that she devoted additional time to learning how the business functioned after the bankruptcy filing, and that for a time she had more frequent telephone calls with Mr. Captan about expenses to be paid. However, no time records were offered and no reliable time estimates were provided, and Ms. Serafis admittedly continued to reside in Greece for 80% of the time.

I conclude that Ms. Serafis failed to carry her burden to prove that the $2,000 weekly salary payments, or any particular portion thereof, were appropriate. I find that all of the post-petition salary payments were unauthorized and are recoverable by the Plan Administrator pursuant to sections 549 and 550 of the Bankruptcy Code.

**B.    Increased Post-Petition Rents Paid to 135 Waverly**

As noted above, Ms. Serafis owned both 135 Waverly and Village Red. It is true that a restaurant must either own or lease the space that it uses. However, that does not mean that the negotiation of new lease terms is a transaction that is done in the "ordinary" course of a restaurant's business. There are many types of transactions in which businesses engage that are properly regarded as "unusual" transactions rather than matters done in the "ordinary" course of business. Significant financings, large contracts and significant leases are not "routine" and instead fall into the "unusual" and significant category. Village Red's prior lease had a term of five years; certainly the negotiation of new rents to be paid for the space that the restaurant used is of a different character than, for example, the routine ordering of food supplies. It was not part of Village Red's normal day-to-day operations.

Furthermore, as noted above, transactions with corporate insiders (including affiliated companies) are subject to heightened scrutiny in bankruptcy. Creditors had the right to expect –

and frankly the Court expected – that any increase in rent that Village Red paid to an affiliated company would be the subject of a motion for court approval, with notice to the affected creditor body so that parties in interest could object to any improper terms. That is particularly true in light of the size of the rent increase that occurred here. Instead, the opposite occurred. Ms. Serafis (and perhaps others) unilaterally decided to increase the rent to $53,000 and also to require Village Red to pay real estate taxes, which Village Red previously had not been required to pay. Counsel to Village Red incorrectly informed this Court that the rent payments had simply been continued in line with historical practices, which was not the case.

I find the $53,000 rent figure to be particularly galling since I also find, based on the evidence, that the purported lease of the premises never was intended to constitute the actual rental agreement between 135 Waverly and Village Red. Nicholas Serafis put the lease terms together; there was no negotiation of them. There also was no intent to pay the rents that were actually specified in the lease. The two businesses were commonly owned, and Village Red always paid $11,000 in rent (not $25,000). The written terms of the lease were regularly and intentionally ignored. The actual agreement and practice was that Village Red would pay rent equal to $11,000 per month. Ms. Serafis testified that her father allegedly promised to pay the full $25,000 at some unknown future time and that the $11,000 payments were merely "on account," but I find that testimony was not credible and that no such agreement existed.

Ms. Serafis argued at trial that Village Red was a "holdover" tenant and that under the terms of the Lease the rent was supposed to double in the event of a holdover. However, as noted above I have found that the Lease never was intended to represent the actual terms on which Village Red leased space from 135 Waverly. Ms. Serafis also argued at trial that she was entitled to "damages" to the extent that Village Red did not make payments in accordance with

the holdover provisions of the Lease.  However, the Lease expired and Village Red never

assumed the Lease as a post-petition obligation.  Any "damage" claim (if one had been asserted)

would only have constituted a pre-petition claim.  It would not have justified the post-petition

payment of the increased rents that were charged. In any event, arguments about the "holdover"

terms are irrelevant.  It is plain from the evidence at trial that what happened here was that Ms.

Serafis imposed the terms of a new lease on both 135 Waverly and Village Red, on terms that

were unreasonable and inconsistent with prior practices and without seeking or obtaining the

court approval that was required.

Ms. Serafis and 135 Waverly argued that higher rents were justified but their proposed

proof was excluded because they had failed to comply with applicable rules regarding the

identification and designation of proposed expert testimony.  More importantly, any arguments

that they might have made about the rents should have been made in the context of a motion

seeking court approval.  The increased rent payments, like the increased salary payments, were

not arm's-length transactions and were not transactions done in the ordinary course of business.

Instead, they were self-dealing transactions that were designed to divert value to an affiliated

company (also owned by Ms. Serafis) to the detriment of the creditors of Village Red.  I agree

with the Plan Administrator's contention that the entire increase in the rent payments (above the

$11,000 that historically had been paid) was unauthorized and is subject to avoidance and

recovery under sections 549 and 550 of the Bankruptcy Code.

Village Red also paid real estate taxes as part of its "new" rent arrangement.  Those

payments were the equivalent of increased rent payments for which Court approval was required

but was not obtained, and they also are recoverable.  However, the evidence at trial did not

suffice to show that Village Red paid for repairs that should have been the responsibility of 135

Waverly or that should have required Court approval, and the Plan Administrator's claim to recover such "repair" costs is denied. The total of the "excess" post-petition rent and real estate tax payments that the Plan Administrator is entitled to recover from 135 Waverly is $891,000 ($767,000 in rent and $124,000 in real estate taxes).

6.      **The Objections to 135 Waverly's Unsecured Claim**

Christine Serafis signed the Disclosure Statement on behalf of Village Red. She was aware of its contents. The Disclosure Statement and the Plan made no provision for any distribution to 135 Waverly as an unsecured creditor. The projected recoveries for unsecured creditors plainly assumed that 135 Waverly would not share in those recoveries. Counsel to Village Red (whose hiring had been arranged by Ms. Serafis and whose retainer was paid by Ms. Serafis) also confirmed on the record that there were no creditors who were entitled to participate as unsecured creditors under the Plan except for employees, the NLRB and Chase Bank.

It was quite clear to the Court, when the NLRB negotiated changes to the terms on which 135 Waverly would purchase the assets of Village Red, that the purpose of the price increase was to ensure that significant value would be available for employee claims rather than being diverted to 135 Waverly itself. It was also quite clear that the Disclosure Statement and Plan contemplated that no portion of the amounts paid by 135 Waverly would come back to 135 Waverly itself through distributions on purported claims that 135 Waverly held against Village Red. For this reason, at the Disclosure Statement hearing, the Court expressly asked whether any of the unsecured claim recoveries would be available to 135 Waverly. Village Red's counsel confirmed that the only creditors entitled to payment as unsecured creditors would be the employees who held allowed claims and Chase Bank.

42

I find based on the evidence that Village Red, 135 Waverly and Ms. Serafis consciously elected not to pursue any unsecured claim on behalf of 135 Waverly and elected instead to propose a plan under which the entire consideration that 135 Waverly had paid for the Village Red assets would be available for the payment of claims held by persons other than 135 Waverly. They obtained confirmation of the plan of reorganization based on those terms (and based on their explicit assurances to this Court) and I hold that they are bound by those terms.

Ms. Serafis and 135 Waverly conceded at trial that parties may object to claims even if the claims have been scheduled and even if the claims are not listed as contingent, unliquidated or disputed. They also conceded at trial that the Plan Administrator has the authority to object to claims and that the Plan Administrator's objections to claims asserted by 135 Waverly were timely. They nevertheless argued that Village Red had admitted the debt owed to 135 Waverly because Village Red listed that debt in its Schedules of Liabilities, and that the Plan Administrator therefore should be estopped from pursuing his objection. Notably, the person who verified the Schedules on behalf of Village Red was Ms. Serafis herself. Effectively, she listed a debt as being owed to her own business. I do not see how equitable notions of estoppel could properly be invoked against the Plan Administrator under these circumstances. The Plan Administrator represents the interests of all creditors, and in performing his duties he is not bound or estopped by self-serving "admissions" made by Ms. Serafis as to amounts that Village Red allegedly owed to another one of Ms. Serafis's wholly-owned companies.

More importantly: even if a debt to 135 Waverly had originally been properly scheduled, and even if a debt had been owed to 135 Waverly, the plan of reorganization plainly contemplated that it would not be included among the unsecured claims that would be entitled to distributions. If 135 Waverly wanted to be treated as a general unsecured creditor under the

Plan, it should have ensured that the Plan provided for such treatment, or it should have objected to the Disclosure Statement and the Plan.  It failed to do so.  The Plan was confirmed long ago, and the order confirming the Plan cannot be revoked at this time.  *See* 11 U.S.C. § 1144.  The Confirmation Order also stated that the terms of the Plan are binding on all parties in interest (including 135 Waverly), and it is far too late for 135 Waverly to seek any relief from that Order. *See* Confirmation Order at 6-7.

I find that the terms of the confirmed plan of reorganization do not permit any recovery by 135 Waverly as part of the general unsecured class of creditors and for the foregoing reasons I sustain the Plan Administrator's objection to the claim.

**7.    Prejudgment Interest**

The Plan Administrator exercised the rights granted to him by section 544 of the Bankruptcy Code to pursue claims that creditors could have pursued under New York law. Successful plaintiffs in litigation in the state courts may recover prejudgment interest at the rate of 9%.  *See* N.Y.C.P.L.R. § 5004.  The Court of Appeals for the Second Circuit has held, however, that when a trustee pursues New York fraudulent conveyance claims under the authority granted by section 544 of the Bankruptcy Code the trustee does not have an automatic right to 9% interest under the CPLR, and that instead the award of interest is subject to the discretion of the trial court.  *See Kittay v. Korff (In re Palermo)*, 739 F.3d 99 (2d Cir. 2014). Under prevailing Second Circuit authorities, the Court has discretion as to whether to award prejudgment interest at all and, if it does, to choose the appropriate rate and the date(s) from which interest should accrue.  *Id*.  The Court similarly has discretion as to whether to award prejudgment interest on the claims asserted under section 549 of the Bankruptcy Code and, if so, as to the appropriate rate and the date(s) from which interest should accrue.

In order to determine whether prejudgment interest should be awarded the Court must consider "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Wickham Contracting Co. v. Local Union No. 3, Int'l Brotherhood of Elec. Workers, AFL-CIO*, 955 F.2d 831, 834 (2d Cir. 1992). In this regard, the purpose of prejudgment interest is to make the plaintiff whole rather than to punish defendants or to provide plaintiff with a windfall. *Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 139 (2d Cir. 2000) (citations and quotations omitted). Although the award of prejudgment interest is discretionary, it should ordinarily be granted absent a sound reason to deny it. *McHale v. Boulder Capital LLC (In re 1031 Tax Grp., LLC)*, 439 B.R. 84, 87 (Bankr. S.D.N.Y. 2010).

### A.    Prejudgment Interest As To The Prepetition Transfers

An award of prejudgment interest is appropriate as to the prepetition transfers to Ms. Serafis because there is a time value to money and the Plan Administrator (and the creditors of the estate) are entitled to compensation for delays in recovering funds. However, I do not agree with the suggestion that interest should accrue from the date(s) of the original transfers. While creditors might have had authority to challenge the transfers on those dates, the Plan Administrator acquired the right to do so only upon the commencement of the Village Red bankruptcy case. Since the claim under section 544 accrued upon the commencement of the case, I believe that the commencement date is the appropriate date from which to measure the accrual of prejudgment interest. This is consistent with other authorities. *See McHale,* 439 B.R. at 89; *see also In re Zohdi*, 234 B.R. 371, 385 (Bankr. M.D. La. 1999) (noting that the purpose of

prejudgment interest in a case under section 544 is to compensate the estate itself for the time it was without the use of the transferred funds).

As Judge Glenn observed in the *McHale* case, courts have adopted many different methodologies for determining an appropriate prejudgment interest rate. Some courts prefer to use the treasury-bill rate that is used in computing post-judgment interest on federal judgments; others have used the New York statutory rate, and still others have used prime or other market interest rates. *Id*. at 88-89. I do not believe that use of the 9% New York statutory rate would be appropriate in this case. The 9% rate was put in place at a time when market interest rates were much higher than they are now. Awarding interest at a 9% rate would over-compensate the Plan Administrator for delays in obtaining funds, and would simply punish the defendants and grant a windfall to the Plan Administrator. On the other hand, the current federal post-judgment interest rate (which is only .08%) is lower than the rates in effect between 2018 and today and would not adequately compensate the estates for the actual time value of money during the periods when these cases were pending.

The federal post-judgment interest rate on the date of the commencement of these cases was 2.09%. While other interest rates may have been higher, the federal judgment rate on the date these cases were filed most closely approximates what the estates could have earned if cash had been available to them, and I find it is the most appropriate way in this case to measure the damages the estates suffered from not having the transferred funds available.

Accordingly, as to the avoided prepetition transfers to Ms. Serafis I will award prejudgment interest at the simple (not compounded) rate of 2.09% from and after April 6, 2018, which was the date on which Village Red filed its bankruptcy petition.

B.      **Post-Petition Transfers**

The Plan Administrator offered evidence of the total amounts of the increased salary payments made to Ms. Serafis and the total amounts of the increased rent payments made to 135 Waverly but did not offer evidence as to the date of each relevant payment.  In the absence of clearer proof I will award prejudgment interest on the post-petition transfers from and after the date on which the Plan of reorganization was confirmed, which was October 17, 2019.  The federal judgment interest rate as of that date was 1.63%.  That rate closely approximates the earnings that the Plan Administrator could have obtained and is the appropriate interest rate to use in computing prejudgment interest on the claims to recover post-petition transfers.

## Conclusion

Based on the foregoing, the Court finds that the Plan Administrator is entitled to the entry of judgments against Serafis and 135 Waverly in the following amounts:

| Entity | Principal | Prejudgment Interest | Totals |
|---|---|---|---|
| Serafis | $433,875 (Prepetition) | $30,880.85 | $623,459.89 |
| | $154,000 (Postpetition) | $4,704.05 | |
| 135 Waverly | $891,000 | $27,216.27 | $918,216.27 |

The Court also finds that the Plan Administrator is entitled to the entry of an order sustaining the objections to the prepetition unsecured claims asserted by 135 Waverly.  The Court will enter an order directing the Clerk of the Court to enter judgments that reflect the foregoing rulings.

Dated:  New York, New York
         August 31, 2021

                              /s/ **Michael E. Wiles**
                              Honorable Michael E. Wiles
                              United States Bankruptcy Judge